We'll start with the first case on calendar, Pagaduan v. Carnival Corporation. I see counsel here. Good morning. I please the court. Your Honor, good morning. My name is Felix Vinduan and I represent Rodrigo Pagaduan, a Filipino seaman who was injured while working as a motorman aboard the sea vessel Queen Mary 2. This is a genuine issue as to the alleged making of the arbitration agreement between the parties such that the district court should have conducted summary trial on this very issue of the making of the agreement before it ruled that the case should be sent to the Philippines for arbitration. We submit appellant submits that there is a genuine issue as to the making of the alleged arbitration agreement and that we also submit the district court judge, the district court committed a reversible error in granting Carnival's motion to compel arbitration to the Philippines and in ruling that section 2 of Pagaduan's contract of employment allegedly incorporated by reference an arbitration agreement that is found in a different document that is entitled standard terms and conditions. I have seven points. First of all, the fact that it's referencing another document doesn't . . . the referencing alone doesn't make it not a document. As long as it's specific to referencing another document that's known to the parties or knowable to the parties, that's all right, isn't it? Yes, Your Honor. Isn't this reference to the regulations produced by the Philippine Board with regard to terms of employment for all Philippine employees on ocean vessels around the world with regard to terms and conditions of employment, overtime, hours of work, pay, et cetera? The document that was referenced by the contract, Your Honor, refers to the POA governing Resolution Number 9 and Memorandum Circular Number 10. Right. And this Memorandum Circular and the Resolution Number 9 reference or standard terms and conditions. Right. This document, the amended standard terms and conditions, was never produced by Carnival. What they produced instead was another separate document that is entitled standard terms and conditions without the modifier amended. And in this submitted document, the produced document, which was not referenced by any of the Memorandum Circular or the Resolution, this document contained a section 29 that really contains an arbitration provision. Yes. Okay. Yeah. What I'm trying to say, Your Honor, is that there is a stretch in connecting the dots from the first document that is mentioned, which is the contract of employment, to the second dot, which is Memorandum Circular Number 10, to the third document, which is the amended standard terms and conditions, never been produced at all. Well, how is it that you know what's contained in that amended document? Somehow you've had it or seen it or the Court was aware of it, wasn't it? I'm not sure if they submitted any amended standard terms and conditions, but . . . How did it get in front of the Court? What was submitted before the Court, Your Honor, was a document entitled standard terms and conditions. What you're trying to say, it's not the amended standard terms and conditions. Did you have any reason or put before the Court any reason to believe that that was different from the document that might have been referenced with regard to your client's employment? There could have been some amendments, but since . . . No, that's not what I asked you. I asked you, did you put before the Court anything to indicate that the document referencing your client's employment was different? No, Your Honor. Okay. Then was the Court out of order then in accepting this as being the standard terms and conditions that were referenced and referenced through the three different documents? Your Honor, that's what we're trying to say. It's a long stretch to connect from the first document to the fifth document. You're saying by its very nature, the fact that it's several jumps, that therefore it can't be incorporated by reference into the original agreement between your client and Carnival? It's not that, Your Honor. There is a break in the connection, Your Honor, because the standard terms and conditions was never mentioned in the second document that was mentioned, which is the POEA Memorandum Circular Number 9 and Regulation Number 10. Are you saying, therefore, that there are no standard terms and conditions that govern this contract? There are standard terms and conditions, Your Honor. Where are they? Are they not in the standard terms and conditions document that you say isn't there? Yes, Carnival produced a document, Your Honor, but what we're trying to say is that Mr. Pagaduan never signed a copy. But you're saying that it refers to the amended standard terms and conditions, that it's a document that wasn't attached, something was attached, that had a connection, and therefore, your argument has to be that there are no governing terms and conditions because the only terms and conditions that were attached are not the ones that were incorporated by reference, correct? Correct, Your Honor. But this also covers things like dental treatment, if necessary, due to an accident. Your client didn't have a right to dental treatment if his teeth were knocked out in the course of a voyage? I'm sorry, I didn't understand, Your Honor. Your question? I'm looking at paragraph 6 of the standard terms and conditions, which says your client is entitled to dental treatment if he suffers a dental problem while on the sea. It describes preexisting illnesses. It deals with many, many subjects, regular working hours. Are you saying that this document did not govern your client's employment? What I'm trying to say, Your Honor, is that Pagaduan, my client, didn't sign a copy of this agreement, and if ever he needed some dental treatment, it could have been covered by some other Philippine legislation, Your Honor. Basically, you're saying that there were no standard terms and conditions attached to, that your client subscribed to. The submitted standard terms and conditions that was submitted was not admissible, Your Honor. The answer is yes. Your client did not agree to any standard terms and conditions, and none of them govern. Yes, Your Honor. Thank you. We'll hear you on rebuttal. Briefly, may it please Your Honors, I think you've hit on the exact point that's at issue here. There were standard terms and conditions. There was a valid contract for the period of time that this event occurred that was signed by Mr. Pagaduan. That valid contract did. And by whom? Well, it's a little bit. There's a manning agency, a Filipino manning agency, that is an agency of Columbia Ship Management, which is another manning agency which then contracts with Carnival PLC, which runs the Queen Mary, excuse me, yes, Queen Mary II, on which he was. Is an agreement to arbitrate valid if it's entered into with an employment agency on behalf of the employer? Yes, it is, Your Honor. It is valid. There's a valid agency connection between all three of the entities. That was proven up in the motion to dismiss pursuant to declarations and other information provided through earlier discovery, which indicated that that valid connection applied through each of these manning agencies going to then Carnival PLC, which operated the Queen Mary II, upon which Mr. Pagaduan had worked for many years under several different contracts, all of which he signed, all of which incorporated the standard terms and conditions of the POEA, which was dictated by the Filipino government as it related to foreign workers, including crew members. The Philippines requires this for anyone who signs on for working on a cruise or some overseas seafaring-type operation. Is that it? It does, yes, sir. Who does that bind, the Philippines Overseas Employment Administration? Well, it binds all of the Filipino cruise workers. That means that they cannot agree to terms and conditions that do not comply with that document without violating Philippine law. Am I correct? They can't. I do not believe they can. They cannot get employment unless they agree to those terms and conditions. They will not be employed. Now, can they enter into a separate contract, altogether something different than that? I suppose if there was something in addition to whatever the standard terms and conditions require, they can get more than those standard terms and conditions, but they certainly can't get less. They can't agree to get less. They cannot agree to get less. What about your client? Just trace for us, if you will, the evidence that we have that Carnival was a party to this contract. Well, the primary evidence, well, first is the employment contract, which names the Filipino Manning Agency. That's a contract between whom? That's a contract between the Filipino Manning Agency, the Columbia Manning Agency, referencing the Queen Mary II, the cruise ship upon which Mr. Pagaduan was employed. The Queen Mary II is owned by Carnival PLC, the British corporation that runs that cruise ship that he had served on for many years. Where is the indication that Carnival was a party to the contract? Well, Carnival is a party of the contract through being a beneficiary to the contract. As indicated in the declarations, there's a contractual relationship between the Filipino Manning Agency, the Columbia Manning Agency, and then Carnival PLC, who owned the Queen Mary II. So Carnival has a contractual relationship with the Manning Agency? Correct. And we have a declaration from the plaintiff that states that Columbia Ship Management was the agent of Carnival, right? Correct. What exactly does the plaintiff say? Does he deny that or affirm that? I think what the plaintiff has said to date is that he has some issue with any privity of contract between all three of them because there was insufficient evidence to establish that. That's what I'm getting from the brief. You have one Joe Milner's declaration that states that Columbia was the agent of Carnival, right? Correct. And we have a declaration from the plaintiff stating the opposite. Is that fair? I don't believe he states the opposite. I believe that he states there's insufficient information been provided to establish that connection. All right. So what are we left with? Is there not then some question of material fact here? Well, I don't believe so. I mean, this is the standard way that cruise ships operate in the Philippines as far as crew members are concerned. The Philippines provides a great many crew members not only for Carnival PLC but cruise lines across the world. And they all operate under the same basic formula. They're manning agencies that recruit these crew members that contract with the various cruise lines, and they provide staff for the various ships. I mean, this is the way, this is the standard practice in the industry. They sign employment agreements with the manning agencies, which references the ships that they're going to be working on, which, you know, pursuant thereto, references the cruise line that owns the ship, and then they are assigned their duties on whatever ship they're going to be working on. Yeah, I get the general idea. But you're arguing that Carnival must be a party to the employment contract because Carnival owns the vessel. Correct. They must be. They own the vessel. They are the owners of the place of employment, so to speak, of the Filipino crew member. The Filipino crew member believes in his complaint he indicated that he worked for Carnival PLC. He claims Carnival is your employer, but he claims he doesn't have an employment contract with you. So I suppose his claim is that he just works for you but is not pursuant to any kind of written agreement. Is there something in the record that shows how you're bound by the POEA? How Carnival PLC is bound by it? Correct. I don't know if there's anything in the record that indicates that specific connection. I don't know that issue has come up in the case. Well, the POEA dictates the terms and conditions of his employment, doesn't it? Correct. And so if Carnival wants to do business with Filipino crew members, it has to agree to abide by the terms and conditions of the POEA. Where do I find that requirement? That's what I just asked you. Your Honor, I don't have it here in front of me. Does the court have it in front of them? I don't think it's ever been before the court. I don't think it's ever been an issue. That's my next question. Was it contested in front of the court that that wasn't the case? It has never been contested, Your Honor. All right. Tell me about what's your view on the issue of arbitration? The court could have stayed the litigation pending arbitration, right? That's the usual way these matters are handled. The district court could have done that if it did not agree that we'd already established the four factors that needed to be established to compel arbitration in the Philippines. The court decided that we had established the four factors and that the issues raised by Mr. Pagaduan were insufficient to overcome that. But you didn't ask the court to stay the litigation for arbitration? We did not ask. We were seeking to compel arbitration. Plaintiff's counsel, I believe, just asked that the motion to compel be denied as opposed to being stayed. What's happened with the arbitration? Has it gone forward or not? No. In the meantime, we had some other discussions, and then the appeal was filed. And I guess with the appeal being filed, that stayed the motion to compel. All right. Thank you. Thank you. We'll hear rebuttal. Thank you, Your Honor. Is Carnival bound by the POEA? We have nothing in. Just straight up, tell me, did you contest that Carnival was bound or not bound by the POEA in front of the district court? Yes or no? That issue has never come up before the district court. So you didn't raise it? You didn't say that Carnival was not bound by the POEA? No. What we did say is that it doesn't even have an agreement that will bind Carnival to the plaintiff, Your Honor. Why would your client sign the terms and conditions of the POEA? Why would he sign such an agreement if it wasn't going to benefit him by someone else being bound by it? Actually, Your Honor, that's the point here. My client never signed those terms and conditions. He signed one for the year before, didn't he? There is nothing. He signed one for 2013? And your complaint was that that wasn't the one that governed the year in question, wasn't it? I'm not sure if there is a document that he signed. In August 2014, he executed an employment agreement, didn't he? August? That's JA94 and 195. And his contract was approved by the POEA. That's JA94. Isn't that the case? 2014, yes. So he signed a POEA, right? Why would he sign it? What was the benefit to him of signing that, so he could work for Carnival? He didn't actually know where he was going to be assigned at. So he had to sign. So why would he sign it? Because it doesn't protect him if somebody else doesn't sign it or agree to it, right? What he signed, Your Honor, is the one-page employment contract. I understand that. Okay. So he showed up at the Queen Mary II without knowing what he'd be paid, under what terms, what health coverage there would be, how long he would be. I mean, he must have shown up under some contract. He wasn't grabbed out of a bar by pressmen and forced to serve on the Queen Mary II, right? Your Honor, the terms and conditions of his employment, like his compensation, are actually stated in the one-page employment contract. But there were no other terms and conditions that applied. The terms and conditions there are the rate of his pay, his position, the duration of the employment, his overtime and his vacation, and I think his leave benefits. Sorry. It's just a one-page employment agreement. And that's just basically what he signed. Setting aside these various important questions, what do you regard as your client's best interest? Do you want arbitration or do you want this litigated in the district court? And why do you choose the particular venue that you would like to have? We would rather have the case litigated here in New York as there are acts that happen here in New York. We believe that he has better rights under the Jones Act as compared to going back to the Philippines where his rights are not limited. And as far as we know, his Jones Act causes of action will not be taken cognizance of by the labor arbiters over there. So we would rather have that he would have better benefits to secure if he files his case here in New York. So you've opposed or you now oppose arbitration, right? You don't want arbitration. That's what we don't want to do. We would rather have the case to be litigated here, Your Honor. Thank you. Thank you both. We'll reserve decision.